## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Randy O'Bryan, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Pember Companies, Inc.,<br><br>Defendant. | Court File No.: 3:20-CV-00664-JDP<br><br>**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DECERTIFY THE CONDITIONALLY CERTIFIED COLLECTIVES AND DISMISS LATE OPT-INS** |

## <u>INTRODUCTION</u>

Plaintiff Randy O'Bryan commenced this action in July 2020, purporting to represent two collectives of Pember Companies employees for claims brought under the Fair Labor Standards Act. In the over year-and-a-half since bringing suit, O'Bryan has benefited from significant time to take discovery into his individual and the collectives' claims. In that same time, only 15 individuals have opted into this action after receiving notice under the Court's conditional certification, and one of them was too late, leaving only 14 FLSA opt-ins. Pember now moves to decertify the collectives.

The Court should decertify both collectives for many reasons. Plaintiffs are not similarly situated and their claims should not be adjudicated collectively. As to the "travel time" collective, there was no written policy requiring employees to go to Pember's shop before going to a job site. To the contrary, employees were expected to report directly to the job site unless they voluntarily opted to ride with the foreman in a company vehicle. Determining liability (and damages) on the travel time claims will require individualized fact finding as to many issues such as what was each opt-ins

subjective understanding of this allegedly unwritten policy, what work days did each opt-in actually to go the shop prior to going to the job site, did he or she do any work at the shop, and many others. Such individualized fact finding is necessary to adjudicate liability and damages, and that is not consistent with a collective action.

Likewise, Plaintiffs' "non-discretionary compensation" claim does not challenge a singular, uniformly applied policy of not including bonuses in overtime calculations. It purports challenges at least three different types of bonuses Pember offered, each with their own eligibility criteria, some applying to some of the opt-ins, some not applying to the options at all. Employees could also choose to receive one of these bonuses, the profit-sharing bonus, as either a contribution to their 401(k) account or in cash. Here again, determining liability and damages for the "non-discretionary compensation" collective requires individualized fact finding that is not suited for collective consideration under the FLSA.

Because Plaintiffs are not similarly situated, the Court should decertify both collectives. If the Court does not decertify both collectives, then it should dismiss those late opt-ins.

## FACTS

### A.   Pember and Named Plaintiff O'Bryan

Pember is based in Menomonie, Wisconsin and specializes in construction, concrete, and excavating work. (Decl. of Brent Pember in Supp. of Def.'s Mot. to Decertify ¶ 2.) Larry Pember started the Company in 1975, and subsequently handed it

off to his three sons, Joe, Eric, and Brent. (*Id.*) Pember works on excavations, grading, and street construction projects throughout Wisconsin and eastern Minnesota. (*Id.*)

O'Bryan began working for Pember in March 2018 as a general laborer. (Answer ¶ 25.) At the outset of his employment, O'Bryan (like all other Pember field employees) received a copy of Pember's Field Handbook. (Pember Decl. ¶ 3.) O'Bryan signed and acknowledged that he read and understood the Field Handbook. O'Bryan's employment with Pember ended in June 2020. (Answer ¶¶ 14, 18.)

### B.    Pember's Travel Time Policies

Pember's Field Handbook clearly explains that field employees[1] were expected to provide their own transportation directly to the job site where they would be working. Pember's policy is wholly consistent with the law, most specifically, the Portal-to-Portal Act. Pember's written policy about travel to job sites is straightforward and tells each employee exactly what work was compensable and what was not:

> Employees may be required to travel as part of their employment. Employees must report to the job site to which they are assigned at the starting time, unless the employee has been directed to report elsewhere. Employees will be released from work at the job site. All employees are expected to furnish their own transportation to and from the job site. When there is available space in a company vehicle traveling to a job site, you may request permission to ride along, but travel time will not be considered time worked. When travel time is considered time worked, it shall be paid for at the federal minimum wage rate per hour.

---

[1] In this brief, Pember uses "field employee" to refer to those employees in any position who primarily worked at job sites, in contrast to shop employees who primarily worked in Pember's Menomonie shop or in the Company's administrative roles.

(Pember Decl. ¶ 3, Ex. A at p. 19.) As the policy makes plain, employees were required to report directly to the job site and were released from work at the job site. (*Id*.)

Nothing in the policy mandated that an employee show up at the shop in Menomonie at the start of the work day, and then travel to the job site after that. (*Id*.) Similarly, nothing in the policy mandated that employees travel back from the job site to the shop in Menomonie before they were released from work. (*Id*.) Any opt-in's subjective understanding of the policy differs from the objective words written on paper in any way would present individualized fact issues. (*See generally* Dkts. 58-65 (declarations of opt-ins explaining their subjective, individual understandings of Pember's travel policies).)

### 1. Permissive Carpooling from the Shop to the Job Site is Not Compensable Travel Time

Riding along from the shop to a job site was permissive. Although a field employee could request to ride along in a Company vehicle to a job site, such a request was an exception to the rule. Pember did not always send enough Company vehicles to a job site such that all employees could ride along to every job site, every day. (*Id.* at ¶ 4.) The travel policy also explains that an employee's work day did not begin at the shop simply because they voluntarily carpooled in a Company vehicle. (*Id.* at ¶ 3, Ex. A at p. 19.) Even when an employee voluntarily rode in a Company vehicle, they were not expected to perform work at the shop before travelling to the job site. (*Id.* at ¶ 3.)

At the end of the workday, Pember dismissed its field employees from the job site. (B. Pember Decl. at ¶ 3, Ex. A at p. 19.) Pember did not direct or ask field employees to

drive back to the shop to help unload equipment before going home. (*Id.* at ¶ 6.) Field employees who had received a ride in a Company vehicle were also "dismissed" at the job site. (*Id.* at ¶ 3, Ex. A at p. 19.) Those employees rode in a Company vehicle back to the shop, but were not required to perform any additional work after the end of the work day on the job site. (*Id.* at ¶ 6.) Once they returned to the shop, the field employees were free to go home. (*Id.*) The shop employees or those otherwise requested to mobilize equipment or unload equipment from the vehicles were paid for that time. (*Id.*)

## 2. Loading and Unloading Trucks at the Shop, Then Travel to the Job Site is Compensable Travel Time

If an employee was asked by his or her foreman to come to the shop and help load or unload vehicles before traveling to a job site, then he or she was compensated for his or her travel time. (Decl. of Daniel Supalla in Supp. of Mot. to Decertify ¶ 2, Ex. A, Deposition of Barry Garfield at 28:22-29:8 ("Garfield Dep.").) Similarly, if an employee drove one of Pember's work trucks from a job site back to the shop, then he was paid for the travel time from job site to shop. (*Id.* at 27:7-15.) In those situations, however, the field employee was not paid to drive from his or her house to the shop, or from the shop to home, consistent with federal regulations. (Pember Decl. ¶ 7.)

## 3. Foremen Correctly Recorded Compensable Travel Time

The employee was expected to complete their own time card accurately for each pay period. (*Id.* at ¶ 3, Ex. A at p. 20.) Foremen for each project recorded employee time in Heavy Jobs daily. (Garfield Dep. 33:25-34:6.) Field employees verified their time to their foreman during each days' work and then their hours were posted every week in the

5

shop for them to review and verify any changes to Bridget Marshall. (Pember Decl. ¶ 8.)
The Company <u>never</u> instructed its field employees or foremen <u>not</u> to record their travel
time if they performed work at the shop before or after working at a job site. (*Id.*) In other
words, if a field employee had compensable travel time, it was always recorded.[2] (*See id.*)

## C.   Pember's Bonus Offerings

During the relevant time period, Pember offered three different potential bonuses
to its employees: (1) an attendance incentive, (2) a referral bonus, and (3) a profit-sharing
bonus. (*Id.* at ¶ 9.) Each bonus had its own prerequisites that an employee was required to
meet in order to earn the particular bonus.

### 1.   Attendance Bonus

An employee could earn the attendance incentive, as the name implies, by having
perfect attendance in a given month. (*Id.* at ¶ 3, Ex. A at p. 21.) An employee earned $10
for the first month of perfect attendance, $25 for the second month, and $50 for each
additional month of perfect attendance. (*Id.*) An employee who was absent or tardy more
than three times per season was not eligible for the bonus. (*Id.*) In 2018, Pember awarded
an additional bonus of $500 to employees who had perfect attendance from August 1
until the end of the work season, including O'Bryan. (*Id.* at ¶ 10.) This was on top of

---

[2] Some Opt-Ins filed declarations with Plaintiff's motion to certify a Rule 23 class and
asserted that they subjectively believed they were to be paid for travel time but were not
paid. (*See e.g.,* Dkt. 64, Declaration of Dustyn Topper at ¶ 16.) Pember did not receive
any reports of these discrepancies either when employees verified their time with their
foreman or when hours were posted weekly. (Pember Decl. ¶ 8.) The company would
have expected some discrepancies to be reported given that some one-way trips were
more than 4.5 hours long. (Topper Decl. ¶ 6 (noting 4.5 hour one-way trips).)

what it generally provided as an attendance bonus because the Company had struggled with attendance that year and wished to reward those whose attendance had been exceptional. (*Id.*)

### 2. Referral Bonus

The Company also provided a referral bonus to current employees who happen to recruit qualified candidates to fill needed positions. (*Id.* at ¶ 3, Ex. A at p. 22.) The amount of the bonus an employee received turned on the role the referred candidate was hired for and the experience the candidate brought to the job. (*Id.*) Pember paid the bonus in installments: it paid 25% of the bonus on the new employee's start date, and an additional 25% after the new employee completed 100 hours, 400 hours, and 800 hours of service. (*Id.*) Referrals were not a regular part of any employees' required job functions and not part of any employee contracts. (*Id.* at ¶ 11.)

### 3. Profit Sharing Bonus

Finally, Pember offered its employees a profit-sharing bonus. The Company retained full discretion regarding the amount of the bonus, including whether it was paid at all in a given year. (*Id.* at ¶ 12.) To receive the bonus, the employee had to be employed with Pember in June of the following year when the bonus was paid. (Garfield Dep. 69:25-70:6.) If a bonus was paid that year, the employee could choose to have the full bonus deposited in their 401(k) retirement account or they could have the bonus cashed out, with 15% withheld for payroll taxes. (Pember Decl. ¶ 12.) Depending on the year and the employee's position, an employee received the bonus either as a fixed dollar amount or as a percentage of their salary for non-wage rate jobs. (*Id.*) Even when Pember

7

indicated a desire to offer its employees a profit-sharing bonus, it was always clear that it

did not guarantee the bonus would be paid each year. (*Id.*)

### D.    The Opt-In Plaintiffs

On August 9, 2021, the parties stipulated to conditional certification of O'Bryan's

two proposed collectives under the FLSA: the travel time collective and the non-

discretionary compensation collective. (Dkt. 40, Stip. for Conditional Cert. (Aug. 9,

2021).) The "travel time collective" was defined by Plaintiff as:

> All hourly-paid, non-exempt employees employed by Defendant within three
> (3) years immediately prior to the filing of the Complaint (ECF No. 1) who
> traveled between Defendant's "shop" and job sites at any time during the
> three (3) years immediately prior to the filing of the Complaint.

(*Id.*)

> The "non-discretionary compensation collective" was defined by Plaintiff as:

> All hourly-paid, non-exempt employees employed by Defendant within three
> (3) years immediately prior to the filing of the Complaint (ECF No. 1) who
> received non-discretionary forms of compensation such as attendance and
> performance bonuses at any time during the three (3) years immediately prior
> to the filing of the Complaint.

*Id.* The Court approved the stipulation on August 10, 2021. (Dkt. 41.)

The parties' stipulation included notice and opt-in form to be sent to each putative

collective member. (Dkt. 40.) If a putative collective member wished to join this lawsuit,

they were to postmark their opt-in form within thirty days of the forms being mailed. (*Id.*

at 2.) Notices were mailed on September 3, 2021. (Supalla Decl. Ex. D (email from M.

Luzi stating date of mailing).) All opt-in forms must have been postmarked by October 3,

2021. (Dkt. 40.)

Out of approximately 170 potential opt-in plaintiffs, only 15 individuals returned a consent forms to join the FLSA collectives. (*See* Dkts. 42-47, 49-50, Notice of Filing Opt-In Consent Forms (various dates).) One of these individuals, Zakery Wieman, did not execute his consent form until October 10, 2021, and it was not filed until a month later. (Dtk. 50, Notice of Filing Opt-In Consent Form Ex. A (Nov. 3, 2021).)

### E. Some Opt-Ins Participated in a Prior Class Lawsuit

Eight of the 15 Opt-In Plaintiffs were also previously part of a class action settlement in an action against Pember for unpaid wages: Shawn Bauer, Joel Lande, Peter Olson, Matthew Richardson, Cameron Sarnstrom, Tyler Swanson, Kyle Westerberg, and Zakery Wieman. (Decl. of Daniel Supalla ¶ 4, Ex. C.) That class action case involved claims by Pember employees who were allegedly: "(1) not paid for drive time between a Pember jobsite and the Pember shop immediately after working in the shop; (2) [] not paid for drive time between a Pember jobsite and the Pember shop immediately before working in the shop …." (*Id.* at 1.)

As part of that settlement, the individuals released all claims against Pember that they then "or ever had against [Pember] arising out of Pember's alleged failure to pay compensation through" the date the Agreement was fully executed by the parties on May 31, 2018. (*Id.* at ¶ 3, Ex. C at p. 6, § 6.) Thus, Pember may assert defenses against some or all of these eight individuals that they were already paid for the time they now seek to be compensated as part of the collective, and also that they cannot claim they were ignorant of the practices they now claim were problematic having received notice of the

prior allegations and settlement of those claims. Moreover, they may be subject to the defense of claim preclusion as well.

## ARGUMENT

Plaintiffs who wish to pursue FLSA claims as a collective bear the burden of showing they are similarly situated such that their claims may be decided on a collective-wide basis. Plaintiffs cannot carry that burden here, as both conditionally certified collectives will require individualized adjudication of their claims. The Court should decertify both collectives and dismiss all Opt-In Plaintiffs.

## I.    LEGAL STANDARD GOVERNING FLSA COLLECTIVE CERTIFICATION

A plaintiff may bring their FLSA claims in a representative capacity on behalf of other employees, but only if the plaintiff can show they and the other putative plaintiffs are "similarly situated." 29 U.S.C. § 216(b). Most courts, including the Western District of Wisconsin, have adopted the two-step certification process. *E.g.*, *Kasten v. St.-Gobain Perf. Plastics Corp.*, 556 F. Supp. 2d 941, 956 (W.D. Wis. 2008). In the first step, the plaintiff may make a minimal showing that a collective action is appropriate, and thereby receive court authorization to notify potential opt-in plaintiffs of the pending litigation. *Id.* In the second step, the representative and opt-in plaintiffs, having the benefit of discovery, must show they are similarly situated. *Austin v. Cuna Mut. Ins. Soc'y*, 232 F.R.D. 601, 605 (W.D. Wis. 2006). At this second stage – where we are at in this case – "the court examines in detail the evidence and arguments submitted by the parties on the question of similar situation[,]" and decertifies the collective if the members are not similarly situated. *Id.*

The Seventh Circuit has held the FLSA's "similarly situated" requirement is indistinguishable from class action certification standard under Rule 23 of the Federal Rules of Civil Procedure. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) (noting "there isn't a good reason to have different standards for the certification of the two different types of actions, and the case law has largely merged the standards, though with some terminological differences."). To be similarly situated, the Plaintiffs must show "common questions predominate" and that adjudication of liability will not "depend[] on a detailed, fact-specific inquiry . . . ." *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010). "[A] common question predominates over individual claims if a 'failure of proof on the question would end the case and the whole class will prevail or fail in unison." *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 378 (7th Cir. 2015) (internal quotations omitted); *see also Laughlin v. Jim Fischer, Inc.*, 2019 U.S. Dist. LEXIS 55473, at *12-13 (E.D. Wis. Mar. 31, 2019) (applying predominance analysis to FLSA collective). "What matters to class [or collective] certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis original).

## II.   THE COURT SHOULD DECERTIFY BOTH CONDITIONALLY CERTIFIED FLSA COLLECTIVES

### A.   Neither Collective is Sufficiently Numerous to Warrant Collective Treatment

Because collective certification largely follows the requirements of Rule 23 class certification in the Seventh Circuit, courts consider whether the collective is sufficiently

"numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *De Leon v. Grade A Constr., Inc.*, 2017 U.S. Dist. LEXIS 205630, at *4-5 (W.D. Wis. Dec. 13, 2017) (citing *Espenscheid*, 750 F.3d at 772, and applying numerosity requirement to FLSA collective). Courts generally find that "classes numbering *fewer than 21 fail* to meet the numerosity requirement." James Wm. Moore, 5 Moore's Fed. Prac. § 23.22(1)(b) (3d ed.) (emphasis added). Here there are a mere 15 collective members.

Plaintiffs cannot show their collectives are sufficiently numerous. Despite the benefit of court-assisted notice, only 15 individuals (out of 160 total) signed and returned their opt-in consent forms. As explained further below, one of those individuals returned his forms more than a week after the time to do so had passed. So, only 14 individuals have opted in to the travel time and non-discretionary compensation collectives for this litigation. That number is far below what courts generally consider sufficiently numerous, including the 20 to 25 member class this Court has previously found insufficient. *See De Leon*, 2017 U.S. Dist. LEXIS 205630, at *7-9 (applying Rule 23(a)(1)'s numerosity requirement to FLSA collective); *Zettler v. Thurs Trucking, Inc.*, 2019 U.S. Dist. LEXIS 72130 (W.D. Wis. Apr. 30, 2019) (same); *see also Anderson v. Weinert Enters.*, 986 F.3d 773, 777 (7th Cir. 2021) ("The key numerosity inquiry . . . is not the number of class members alone but the practicability of joinder. Answering that question requires evaluation of the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute.") (internal quotations omitted).

Moreover, in reality there are far fewer opt-ins with full claims against Pember because 8 of the opt-ins participated in prior litigation involving the same travel claims and were paid. (Supalla Decl. ¶¶ 3-4, Exs. B-C.) As part of that settlement agreement, they released compensation claims they had against Pember through 2018, which overlaps with the period here. (*Id.* at ¶ 3, Ex. B at § 6.) Furthermore, any claims they may seek to bring (or opt into) now are also barred by the doctrine of claim preclusion. *E.g.*, *Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442, 449-454 (5th Cir. 2016) (holding plaintiffs' FLSA claims were precluded by a prior state law class settlement).

Whether the ultimate collective is 15 or eight, either is an insufficient number to proceed as a collective action. The Court should conclude that neither FLSA collective is not sufficiently numerous to warrant collective treatment under the FLSA.

### B.      The Members of the "Travel Time Collective" are Not Similarly Situated

Even assuming the collectives were sufficiently numerous, the members of the travel time collective are not similarly situated, but rather "hopelessly heterogeneous." *Jonites v. Exelon Corp.*, 522 F.3d 721, 725 (7th Cir. 2008). As defined, the travel time collective includes any employee "who traveled between Defendant's 'shop' and job sites at any time" during the relevant time period. (Stip. for Conditional Cert., Dkt. No. 40.)

For starters, none of Pember's policies mandated that an employee travel to the shop and then to the job – carpooling was permissive. When an employee was asked to help load/unload vehicles at the shop prior to traveling to the job site, or he drove vehicles back to the job site at the end of the work date, that time was recorded and paid.

13

Neither of those are FLSA violations. Travel must be "part of [the employee's] principal activity, such as travel from job site to job site during the workday[.]" 29 C.F.R. § 785.38; *see also id.* at § 785.35 ("Normal travel from home to work is not worktime."). Any determination of liability on the FLSA travel time claim – in light of Pember's clear policies – will absolutely require individualized fact finding to determine whether any of the collective members were asked to performed work at the shop before or after travelling between the shop and a job site, or asked to haul equipment to or from a job site. *See Jonites*, 522 F.3d at 725 ("The plaintiffs in this case want us to rule that become some Com Ed employees may sometimes do some work at lunch, all Com Ed employees are entitled to pay  during their lunch break . . . . that is preposterous.").

There is no other way to determine liability except for on a day-by-day, employee-by-employee basis. To start, there was no common policy or practice that violated the FLSA. Pember clearly instructed its field employees to report directly to a job site, not the shop. (Pember Decl. ¶ 4.) Although some field employees voluntarily went to the shop to carpool to the job site, the Company did not mandate that and did not require them to perform any work between arriving at the shop and the carpool leaving for the job site. (*Id.* at ¶ 5.) If field employees were asked by their foreperson to help load/unload vehicles before or after travelling from the shop to the job site, Pember's policy required them to record their time so they could be compensated for it. (Supalla Decl. ¶ 2, Ex. A at 29:4-8.) That time was recorded and paid.

Even more important is that the Opt-In Plaintiffs appear to hang their hats on an alleged *unwritten* policy or practice that only exists in their subjective, individual minds.

14

Because Pember did not maintain a policy of requiring field employees to begin their day working at the shop before travelling to a job site, any liability determination is inherently individualized. A factfinder will first have to determine whether each Plaintiff ever even reported to the shop before travelling to a job site. If that occurred, then the factfinder must then determine whether they were asked to show up by their foreman, whether each plaintiff actually performed work at the shop, and did not merely show up to catch a ride, and how much work (time-wise) was performed. All of these are individual inquires not suited to collective treatment. *See, e.g., Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 641 (N.D. Cal. 2010) (denying class certification where individual inquiry would be required into whether particular employees skipped meal breaks and why).

Calculating damages will require further individualized determinations of how frequently each Plaintiff performed work at the shop before or after travelling between the shop and a job site, and the estimated travel time the Plaintiff should have been compensated for. *See Espenscheid*, 705 F.3d at 773-75 (considering as part of the certification analysis the difficulty of calculating damages for the individual Plaintiffs). Opt-In Plaintiffs have the strict burden to show work was performed but not compensated. *See, e.g., Rapp v. Network of Cmty. Options, Inc*., 3 F.4th 1084, 1087 (8th Cir. 2021) (employee always has strict burden to work performed work was unpaid).

The Eastern District of Wisconsin recently considered a "travel time" claim similar to Plaintiffs' in *Laughlin v. Jim Fischer, Inc.* There, the court concluded the travel time claim was not amenable to class or collective treatment because "determination of

the claim for each employee will require an individualized consideration of the circumstances surrounding the hiring, training, and behavior of each employee to determine whether they reasonably believed they should not record travel time even if they performed loading work at the shop before or after going to a job site." *Laughlin*, 2019 U.S. Dist. LEXIS 55473, at \*13-14. The *Laughlin* case was arguably a closer call than here, as the plaintiffs recorded their time working at the shop, just not the travel time in between. *Id.* at \*10. Yet the court concluded the individualized determinations to be made did "not meet the commonality requirement of Rule 23 or what is needed for an FLSA collective action to be justified." *Id.* at \*14. The same is true here.

The individualized nature of Plaintiffs' travel time claim also gives rise to individualized defenses for each Plaintiff, which undermine the rationale for proceeding as a collective action. *Teed v. Thomas & Betts Power Solutions, LLC*, 2012 U.S. Dist. LEXIS 198866, at \*14-15 (W.D. Wis. Jan. 11, 2012) (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001). If the specific Plaintiff failed to report even the shop work on their timecard, Pember may argue it lacked either actual or constructive knowledge of the need to compensate the Plaintiff for the related travel time. *See Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017) (noting the FLSA "stops short of requiring the employer to pay for work it did not know about, and had no reason to know about."). This is particularly problematic for the Plaintiffs in this case because, if they were doing such work, it was without the knowledge or approval of their foremen, because foremen (1) made requests of field employees to aid in loading/unloading trucks before or after going to the job site and (2) recorded the Plaintiffs' time worked in Heavy

Job with the employee at the end of the day; and (3) posted all timesheets for review and verification. (Garfield Dep. 33:25-34:13; Pember Decl. ¶ 8.) If employees were performing uncompensated work of any sort and failed to report it to his or her foreman, then the FLSA "stop short" or requiring Pember to pay for it. *Allen*, 865 F.3d at 938. All of this, of course, means that individual inquiries will be required to determine facts supporting any one of those three factors.

Pember also has strong defenses against Opt-in Plaintiffs Bauer, Lande, Olson, Richardson, Sarnstrom, Swanson, Westberg, and Weiman, who each participated in a prior settlement and released claims against Pember – or are claim precluded from bringing new claims arising out of the same set of practices. Those defenses will not apply to all of the members of the collective, only some of them, thus warranting decertifying the collective due to these individual issues. *E.g.*, *Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 820 (N.D. Ill. 2010) ("The availability of defenses to some but not all of the putative class members . . . poses significant case management concerns.") (quoting *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 954 n.8 (11th Cir. 2007)).

Plaintiffs bear the burden of coming forward with evidence that they are similarly situated, and they cannot. There is simply no way for Plaintiffs to demonstrate collective liability on the travel time claims. It's person-by-person, or not at all. They can point to no written common policy or practice to not pay field employees for compensable travel time. Pember's liability – which it denies exists at all – will require each Plaintiff to establish his own subjective understanding of an unwritten policy that is directly contrary to the Company's written policy. And, assuming that can be done on a collective basis,

each Opt-In must show on a day-by-day, shift-by-shift basis that he performed

compensable work at the shop before or after travelling between the shop and the job site,

and how often they supposedly did so, and why he didn't report it at the time.

Additionally, travel to and from home to the worksite is not considered compensable

time. 29 C.F.R. § 785.35.

Under the facts and circumstances of this case, any claim under the FLSA should

only proceed on an individualized basis, not as a collective.

**C.    The Non-Discretionary Compensation Collective is Not Similarly Situated**

Likewise, the members of the conditionally certified "non-discretionary

compensation" collective are not similarly situated. The collective as defined includes

any employee "who received non-discretionary forms of compensation such as

attendance and performance bonuses at any time during the" three years before O'Bryan

filed his Complaint. (Dkt. 40.) But liability under the FLSA is not that simple.

To show Pember violated the FLSA, Plaintiffs must show they received a bonus,

that the bonus was non-discretionary, and that Pember failed to include the non-

discretionary compensation in the employee's regular rate of pay for overtime during the

time-period the bonus was earned. The FLSA requires an employer to compensate

overtime at no less than one and one-half times the employee's regular rate of pay. *See* 29

C.F.R. § 778.107.

But not all forms of renumeration are part of the regular rate. Both discretionary

bonuses and sums paid to a bona fide profit-sharing plan or trust are excluded from the

regular rate of pay. 29 C.F.R. § 778.200(a)(3). A bonus is discretionary if "both the fact that the payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly[.]" *Id.*

At issue here are three very different bonuses, each with their own criteria and purpose, and each with different application among employees throughout the organization. Because each bonus Pember offered was different, and not all employees received each bonus, it will be necessary to determine whether each is, in fact, non-discretionary compensation. Even within this analysis, some payments of the same bonus may be discretionary. For example, Pember's special, one-time payment of an additional $500 for perfect attendance in 2018 will require separate analysis from the other attendance bonuses. All of this will have to be determined for each of the Opt-Ins on an individual basis, not collectively, by, *e.g.*, looking at their attendance records.

The nature of the profit-sharing bonus will also require individualized liability determinations. By default, Pember paid any profit-sharing bonus as a contribution to the employee's 401(k) retirement account. Pember Decl. ¶ 12. Pember contends such payments are excluded from the regular rate of pay under 29 C.F.R. § 778.200(a)(3)-(4). Because some employees who received the profit-sharing bonus chose to take the 401(k) deposit rather than the cash-out payment (less withholdings), applicability of this bonus to the regular rate calculations requires a plaintiff-by-plaintiff analysis for the entire three year period of the collective.

Even assuming each of the bonuses discussed above was required to be included in the regular rate of pay for overtime calculations, Pember is only liable under the FLSA if it failed to include the bonus in the regular rate for overtime a Plaintiff worked during the same time they earned the bonus. 29 C.F.R. § 778.209. Each of the bonuses was "earned" at different times throughout the work season. So Plaintiffs must show they worked overtime during the same time they earned the bonus. This cannot be done on a collective-wide basis. Rather, the factfinder must compare each individual Plaintiff's pay records, when bonuses were earned, which bonuses were earned, and then recalculate any rate of pay issues plaintiff-by-plaintiff, pay period-by-pay period, or more likely on a shift-by-shift basis.

Similarly, some employees received the profit-sharing bonus as a percentage of their total income on non-wage rate jobs. Pember Decl. ¶ 12. In such cases, the employee was already compensated for both their straight-time earnings and any overtime they worked. 29 C.F.R. § 778.210. Either way, determining whether the employee was already properly compensated for overtime will require the factfinder to engage in an individualized analysis, not a collective-wide determination. Finally, Pember will again raise the defense of claim preclusion against those Opt-In Plaintiffs who previously benefitted from the class settlement and released claims against Pember. Not all collective members are subject to that defense, so it must be evaluated person-by-person.

As with the travel time collective, Plaintiffs' overly-inclusive collective definitions ignores the many factual differences between each Plaintiff's claim and what each Plaintiff will have to demonstrate to prove Pember's liability. These claims are simply

20

not amenable to collective adjudication. The Court should therefore decertify the "non-discretionary compensation" collective.

## III.   THE COURT SHOULD DISMISS THE UNTIMELY OPT-IN PLAINTIFFS

Alternatively, if the Court declines to decertify both FLSA collectives, Pember respectfully requests that the Court strike tardy Opt-In Plaintiff Wieman as a member of either FLSA collective. "On motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21.

The parties' stipulation to conditionally certify the collectives required that any prospective opt-in plaintiff must have their consent form postmarked within 30 days after the notice was mailed – October 3, 2021.Opt-in Plaintiffs Wieman signed his consent forms October 10, 2021, which was a week after they were to be postmarked. (Dkt. 50.) It is not possible, based on the face of the documents, that Wieman had his postmarked before October 3, 2021. Because it is untimely, he is not a collective member.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should decertify both conditionally certified FLSA collectives and dismiss the 15 Opt-in Plaintiffs from the case. Alternatively, if the Court does not decertify both collectives, it should drop Opt-in Plaintiff Wieman from this litigation because his consent forms were tardy.

Dated:  February 18, 2022

**NILAN JOHNSON LEWIS PA**

By:   */s/ Daniel J. Supalla*
      David A. Schooler (MN #0225782)
      Daniel J. Supalla (MN #0387064)
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
Telephone:   (612) 305-7500
Fax:         (612) 305-7501
Email:   dschooler@nilanjohnson.com
        dsupalla@nilanjohnson.com

**ATTORNEYS FOR DEFENDANT
PEMBER COMPANIES, INC.**