## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

Randy O'Bryan, on behalf of himself
and all others similarly situated,

                              Plaintiff,

        v.

Pember Companies, Inc.,

                              Defendant.

Court File No.: 3:20-CV-00664-JDP

**DEFENDANT'S MEMORANDUM
OPPOSING PLAINTIFF'S MOTION
FOR RULE 23 CLASS
CERTIFICATION**

## INTRODUCTION

Plaintiff Randy O'Bryan seeks to certify two classes for claims asserted under the Wisconsin Wage Payment and Collection Law ("WWPCL"). Class actions are the exception, not the rule. A court may certify a class only if, after rigorous analysis, it finds liability can be resolved in one stroke by the same evidence for every class member. Such class-wide liability requires more than creatively drafting of common questions – a plaintiff must show there is common proof that will lead to common answers and that the questions, proof and answers predominate over any individual issues. For similar reasons, a named plaintiff must also show their claims are typical of the class they purport to represent. Plaintiff Randy O'Bryan fails to make both showings.

O'Bryan rests his motion for class certification on a sleight of hand. He purports to raise common questions for both classes he seeks to certify. But he does not show that the questions share a common answer flowing from common proof. In fact, each of the putative class claims under the WWPCL for travel time payments will require individual liability determinations for every potential single class member. Even then, O'Bryan

cannot show he, as a laborer, has claims typical of the other class members, which includes the foremen who were assigned Company vehicles to use and haul equipment and who had discretion to assign tasks to others.

The same is true for the purported bonus class. Far from having a uniform policy regarding bonuses, Pember Companies, Inc. determined each of the three bonuses at issue would not be included in overtime pay for reasons specific to each bonus. Irrespective of those determinations, under O'Bryan's theory of the case, Pember would only liable to the bonus class if field employees earned a bonus during the same period of time they earned overtime. O'Bryan's claims are also not typical of all of the potential class members, such as foremen or administrative employees. Such individual liability questions determinations predominate over the irrelevant questions O'Bryan asserts are allegedly common to the class.

Finally, class certification is not appropriate merely because the putative class members each assert a violation of the same provision of law. Because O'Bryan has not shown the claims of the putative classes are subject to common proof or that his claims are typical of all members of all classes he seeks to represent in this case, he cannot carry his burden to show class treatment is appropriate. O'Bryan's motion for class certification under Rule 23 for the travel time class and bonus classes should be denied.

## FACTS

### A.      Pember and Named Plaintiff O'Bryan

Pember is based in Menomonie, Wisconsin, and specializes in construction, concrete, and excavating work. (Decl. of Brent Pember in Supp. of Def.'s Mot. to

Decertify ¶ 2, Dkt. 69 ("Pember Decert. Decl.").) Larry Pember started the Company in 1975, and subsequently handed it off to his three sons, Joe, Eric, and Brent. (*Id.*) Pember works on excavations, grading, and street construction projects throughout Wisconsin and eastern Minnesota. (*Id.*)

O'Bryan began working for Pember in March 2018 as a general laborer. (Answer ¶ 25.) At the outset of his employment, O'Bryan (like all other Pember field employees) received a copy of Pember's Field Handbook. (Pember Decert. Decl. ¶ 3, Dkt. 69.) O'Bryan signed and acknowledged that he read and understood the Field Handbook. O'Bryan's employment with Pember ended in June 2020. (Answer ¶¶ 14, 18.)

### B.    Pember's Travel Time Policies

Pember's Field Handbook clearly explains that field employees[1] were expected to provide their own transportation directly to the job site where they would be working. Pember's policy is wholly consistent with the law, including Wisconsin Department of Workforce Development regulations interpreting the WWPCL. Pember's written policy about travel to job sites is straightforward and tells each employee exactly what work was compensable and what was not:

> Employees may be required to travel as part of their employment. Employees must report to the job site to which they are assigned at the starting time, unless the employee has been directed to report elsewhere. Employees will be released from work at the job site. All employees are expected to furnish their own transportation to and from the job site. When there is available space in a company vehicle traveling to a job site, you may request

---

[1] Pember uses "field employee" to refer to those employees in any position who primarily worked at job sites, in contrast to shop employees who primarily worked in Pember's Menomonie shop or in the Company's administrative roles. (Decl. of Brent Pember in Opp'n to Pl.'s Mot. for Class Certification ¶ 2 ("Pember Cert. Opp. Decl.").)

permission to ride along, but travel time will not be considered time worked.
When travel time is considered time worked, it shall be paid for at the federal
minimum wage rate per hour.

(Pember Decert. Decl. ¶ 3, Ex. A at p. 19, Dkt. 69.) As the policy makes plain, employees

were required to report directly to the job site and were released from work at the job site.

(*Id*.)

Nothing in the policy mandated that an employee show up at the shop in

Menomonie at the start of the workday, and then travel to the job site after that; in fact,

the policy was the opposite – you are responsible for getting yourself to the job site every

day and the work day starts when the employee reports to the site. (*Id*. at ¶¶ 3-4, Ex. A at

p. 19.)

Similarly, nothing in the policy mandated that employees travel back from the job

site to the shop in Menomonie before they were released from work. (*Id*. at ¶¶ 3, 6, Ex. A

at p. 19.) Again, the policy was the opposite of what O'Bryan claims: the employees were

responsible for getting themselves home from a job site after the workday. (Pember Cert.

Opp. Decl. ¶ 3.) Any opt-in's subjective misunderstanding of the policy differs from the

objective words written on paper in any way would present individualized fact issues.

(*See generally* Dkts. 58-65 (declarations of opt-ins explaining their subjective, individual

understandings of Pember's travel policies).)

## 1. Permissive Carpooling from the Shop to the Job Site is Not Compensable Travel Time

Pember organized its field employees into crews, with a foreman supervising each

crew. (Pember Cert. Opp. Decl. ¶ 2.) The Company assigns each foreman a crew cab

truck, which they may take home each night. (Pember Cert. Opp. Decl. ¶ 4; Garfield Dep. 32:10-13.) Many, but not all, foremen would drive to the shop in the morning so employees who wished to ride along to the jobsite could do so. (Pember Cert. Opp. Decl. ¶ 4.) This carpooling program for other field employees was completely voluntary for the foremen and the field employees. (*Id.*) Some foremen regularly reported directly to the jobsite most days. (*Id.*) Pember never required its foremen to drive to the shop first so other employees could catch a ride or even pick up supplies. (*Id.*) If supplies were needed, superintendents and shop personnel would load them in advance or deliver them to the jobsite. (*Id.* at ¶ 5.) Cameron Sarnstrom, who previously worked for Pember as a foreman, estimated he only provided carpooling from the shop in his truck "[a]pproximately 65% - 75% of the time[.]" ( Decl. of Cameron Sarnstrom ¶ 10, Dkt. 61.)

For the other field employees, riding along from the shop to a jobsite was also permissive and not compensable according to Pember's written policy. In fact, Pember did not always send enough Company vehicles to a job site such that all field employees could ride along to every job site, every day. (Pember Decert. Decl. ¶ 4, Dkt. 69.) Depending on the individual foreman's preferences, some employees did not meet at the shop, but at other locations to carpool to the jobsite. (*See* Decl. of Joel Lande ¶¶ 10-11, Dkt. 58; Sarnstrom Decl. ¶ 14; Pember Cert. Opp. Decl. ¶ 4.) These arrangements were directly coordinated between the individual foremen and their crews. (Lande Decl. ¶ 11; Sarnstrom Decl. ¶ 14.)  Other field employees who generally rode with their foremen would also drive themselves when the job site was close enough to their home. (Decl. of Kyle Wittig ¶ 10, Dkt. 65.) The Company's travel policy also explains that an employee's

workday did not begin at the shop simply because they voluntarily carpooled in a company vehicle. (Pember Decert. Decl. ¶ 3, Ex. A at p. 19, Dkt. 69.) Even when an employee voluntarily rode in a company vehicle, they were not expected to perform work at the shop before travelling to the job site. (Pember Cert. Opp. Decl. ¶ 6.) In fact, Pember's expectation and instruction to field employees is that they were required to perform work at the shop before traveling to the worksite if they were asked by foreman or supervisor to do so, and agreed to do so. (*Id.* at ¶ 6, Ex. A at p. 2.)

At the end of the workday, Pember dismissed its field employees from the job site. (Pember Decert. Decl. ¶ 3, Ex. A at p. 19, Dkt. 69.) Pember did not direct or ask field employees to drive back to the shop to help unload equipment before going home. (*Id.* at ¶ 6.) Field employees who had received a ride in a Company vehicle were also "dismissed" at the job site. (*Id.* at ¶ 3, Ex. A at p. 19.) Those employees rode in a Company vehicle back to the shop, but were not required to perform any additional work after the end of the workday on the job site. (*Id.* at ¶ 6.) Once they returned to the shop, the field employees were free to go home. (*Id.*) The shop employees or those specifically requested to mobilize equipment or unload equipment from the vehicles by their foremen were paid for that time. (*Id.*; Garfield Dep. Ex. 1 at p. 61.)

### 2.     Loading and Unloading Trucks at the Shop, Then Travel to the Job Site is Compensable Travel Time

If an employee was asked by his or her foreman to come to the shop and help load or unload vehicles before traveling to a job site, then he or she was compensated for his or her travel time to and from the job site that day. (Garfield Dep. 28:22-29:8.) Similarly,

if an employee drove one of Pember's work trucks from a job site back to the shop, then he was paid for the travel time from job site to shop. (*Id.* at 27:7-15, Ex. 1 at p. 61.) In those situations, however, the field employee was not paid to drive from his or her house to the shop, or from the shop to home, consistent with federal and state regulations, including the WWPCL. (Pember Decert. Decl. ¶ 7, Dkt. 69.)

### 3. Foremen Correctly Recorded Compensable Travel Time

Each employee was expected to complete their own timecard accurately for each pay period. (*Id.* at ¶ 3, Ex. A at p. 20.) Foremen for each project recorded employee time, including their own, in Heavy Jobs daily. (Garfield Dep. 33:25-34:6.) Field employees verified their time to their foreman during each days' work and then their hours were posted every week in the shop for them to review and verify any changes to Bridget Marshall. (Pember Decert. Decl. ¶ 8, Dkt. 69.) The Company <u>never</u> instructed its field employees or foremen <u>not</u> to record their travel time if they performed work at the shop before or after working at a job site. (*Id.*) In other words, if a field employee had compensable travel time, it was always recorded and then subject to verification by the employee. (*See id.*)

Some putative class members filed declarations asserting they subjectively believed they were to be paid for travel time but were not paid. (*See e.g.,* Decl. of Dustyn Topper ¶ 16, Dkt. 64.) Pember did not receive any reports of these discrepancies either when employees verified their time with their foreman or when hours were posted weekly. (Pember Decert. Decl. ¶ 8.) The Company would have expected some discrepancies to be reported given that some one-way trips were more than 4.5 hours

long. (Topper Decl. ¶ 6 (noting 4.5 hour one-way trips).) Moreover, one of the declarants, Cameron Sarnstrom, was a foreman who was directly responsible for recording his own time. In the end, all of the putative class members had multiple opportunities to report issues with their time, such as not being paid, but none did. (Pember Decert. Decl. ¶ 8.)

### C.   Pember's Bonus Offerings

During the relevant time period, Pember offered three different potential bonuses to some of its employees: (1) an attendance incentive, (2) a referral bonus, and (3) a profit-sharing bonus. (Pember Decert. Decl. ¶ 9, Dkt. 69.) Each bonus had its own prerequisites that an employee was required to meet in order to earn the particular bonus. O'Bryan argues only the attendance incentive and profit-sharing bonus (which he delineates into two different bonuses) are nondiscretionary, and Pember discusses those below. (Pl.'s Br. in Support of Mot. for Class Cert. ("Pl.'s Br.") 19, Dkt. 54.)

### 1.   Attendance Bonus

An employee could earn the attendance incentive, as the name implies, by having perfect attendance in a given month. (Pember Decert. Decl. ¶ 3, Ex. A at p. 21, Dkt. 69.) An employee earned $10 for the first month of perfect attendance, $25 for the second month, and $50 for each additional month of perfect attendance. (*Id.*) An employee who was absent or tardy more than three times per season was not eligible for the bonus. (*Id.*)

In 2018, Pember awarded an additional, special one-time bonus of $500 to employees who had perfect attendance from August 1 until the end of the work season, including O'Bryan. (*Id.* at ¶ 10.) This was in addition to what it generally provided as an

attendance bonus because the Company had struggled with attendance that year and wished to reward those whose attendance had been exceptional. (*Id.*)

### 2.   Profit Sharing Bonus

Pember also offered its employees a profit-sharing bonus. The Company retained full discretion regarding the amount of the bonus, including whether it was paid at all in a given year. (*Id.* at ¶ 12.) To receive the bonus, the employee had to be employed with Pember in June of the following year when the bonus was paid. (Garfield Dep. 69:25-70:6.) If a bonus was paid that year, the employee could choose to have the full bonus deposited in their 401(k) retirement account or they could have the bonus paid in cash, with 15% withheld for payroll taxes. (Pember Decert. Decl. ¶ 12.) Depending on the year and the employee's position, an employee received the bonus either as a fixed dollar amount or as a percentage of their salary for non-wage rate jobs. (*Id.*) Even when Pember indicated a desire to offer its employees a profit-sharing bonus, it was always clear that it did not guarantee the bonus would be paid each year. (*Id.*; Pember Cert. Opp. Decl., Ex. A at p. 2 (describing June 30 bonus as discretionary).)

### ARGUMENT

O'Bryan bears the burden of showing he and his proposed classes satisfy all the requirements for class certification. However, he cannot show his proposed classes are sufficiently numerous, that there are questions of law or fact common to the class, or that his claims are typical of other putative class members' claims. The Court should deny O'Bryan's motion for class certification in its entirety.

## I.      LEGAL STANDARD GOVERNING CLASS CERTIFICATION

Class actions are an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). "The purpose of class action litigation is to avoid repeated litigation of the same issue and to facilitate prosecution of claims that nay one individual might not otherwise bring on her own." *Chi. Teachers Union, Local No. 1 v. Bd. Of Educ. Of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015). For this reason, a "class may only be certified if the trial court is satisfied, after rigorous analysis, that the prerequisites for class certification have been met." *Id.* (quoting *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011) (vacating class certification)).

Rule 23 of the Federal Rules of Civil Procedure sets forth the prerequisites for class certification. All classes must satisfy the four requirements of Rule 23(a): "numerosity, commonality, typicality, and adequacy of representation." *Anderson v. Weinert Enters.*, 986 F.3d 773, 777 (7th Cir. 2021) (affirming denial of class certification); Fed. R. Civ. P. 23(a). Even if a proposed class satisfies Rule 23(a), a plaintiff must also show it meets the requirements of one of the categories of Rule 23(b). *Chi. Teachers Union*, 797 F.3d at 434.

Here, O'Bryan asserts he has shown his proposed class satisfies Rule 23(b)(3), which requires a class seeking monetary damages to show "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *Howard v. Cook Cty. Sheriff's Office*, 989 F.3d 587, 607 (7th Cir. 2021) (reversing grant of class certification).

As the party seeking certification, O'Bryan bears the burden to show "certification is proper by a preponderance of the evidence." *Anderson*, 986 F.3d at 777 (affirming denial of class certification).

## II.     THE PROPOSED CLASSES DO NOT SATISFY RULE 23(a)

### A.     The Proposed Classes are Not Sufficiently Numerous

O'Bryan's request for class certification stumbles out of the gate. He asserts he "possesses a good-faith belief that the Rule 23 Classes as defined herein are comprised of a relatively similar number of individuals as compared to the putative collectives[,]" which are potentially numerous enough to warrant class certification. Pl.'s Br. 18, Dkt. 54. But "good-faith belief" is not the standard – facts are required to meet his evidentiary burden.

"The key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder." *Anderson*, 986 F.3d at 777 (affirming trial court's denial of class certification where plaintiff "presented no evidence showing that coordinating with the two out-of-state class members would present such difficulties that joinder of approximately 40 local employees of a small roofing company would be impracticable."). Rather than adherence to an arbitrary threshold number, the numerosity analysis "requires evaluation of 'the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute.'" *Id.* (quoting 7A C. Wright & A. Miller, Federal Practice & Procedure § 1762 (3d ed.)). A plaintiff "cannot rely on conclusory allegations that joinder is

impractical or on speculation as to the size of the class in order to prove numerosity[.]"
*Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989).

O'Bryan asserts he has satisfied the numerosity requirement because Pember
previously produced a list of approximately 170 employees. But this assertion is the sort
of conclusory speculation eschewed by the Seventh Circuit. The conditionally certified
collectives both extended back three years from the filing of the Complaint, while the
WWPCL classes only extend back two years from filing. *Compare* Compl. ¶ 54 *with id.*
at ¶ 63. The collectives are necessarily larger than the proposed classes because they
include an additional year of employees. Moreover, O'Bryan does not provide any facts
or analysis about how many individuals are part of each of the two *separate* classes he
seeks to certify. Even if one of the classes is sufficiently numerous, it does not follow that
both are sufficiently numerous. O'Bryan conflates, and then inflates any reasonable
estimate of each putative class's size.

Even accepting O'Bryan's comparison to the FLSA collectives, the evidence
shows interest in joining the class is very weak, and the number of class members may be
far fewer than O'Bryan's "good faith" estimate. *See De Leon v. Grade A. Constr., Inc.*,
2017 U.S. Dist. LEXIS 205630, at *5-6 (W.D. Wis. Dec. 13, 2017) (denying class
certification after considering the lack of interest in related FLSA claim from putative
opt-ins). Here, less than 10% of those notified opted in to the collective; out of 170
notified, 15 opted in. In *De Leon*, the court concluded plaintiffs had not shown "that it
would be difficult to locate and contact each potential plaintiff to ask whether he or she
would be interested in joining the case." *Id.* at *5. Rather, plaintiffs had alleged they had

already identified most of the putative class members, who were "current or former employees of a single employer at a single location," making it unlikely that the employees were geographically dispersed. *Id.* (citing Wright & Miller, *supra*, at § 1762). Despite the opportunity to join the collective, very few did. *Id.* at *5-6. Given the lack of interest in the collective action and lack of geographic diversity, joinder of the putative class members was not impracticable. *Id.*

The same is true here. O'Bryan has a list of putative collective members that he merely guesses is similar to his putative classes. Pl.'s Br. 18, Dkt. 54. All of these employees worked for Pember, which has one physical location. *Id.* at 7. Although O'Bryan sent notices to approximately 170 individuals, only 15 of them executed and returned opt-in consent forms to join the FLSA claim. *See* Dkts. 42-47, 49-50, Notice of Filing Opt-In Consent Forms (various dates). Given the paucity of interest in the collective actions to which he compares his putative classes, O'Bryan has failed to demonstrate the touchstone of numerosity – that joinder would be impracticable. *See Anderson*, 986 F.3d at 777; Wright & Miller, *supra*, § 1762 ("[E]vents subsequent to the institution of the action, *such as intervention* or widespread opting out by members of a Rule 23(b)(3) class, may make joinder practicable and lead to a re-evaluation of the propriety of class-action treatment." (emphasis added)).

Because O'Bryan has failed to show that either of his putative classes are sufficiently numerous, his motion for class certification fails and certification should be denied.

**B.    The Proposed Classes Lack Common Questions Capable of Common Resolution**

O'Bryan also fails to show either of his proposed classes pose questions of law or fact common to every single member of the purported class. Any "competently crafted class complaint literally raises common 'questions.'" *Wal-Mart*, 564 U.S. at 349. As the U.S. Supreme Court has stated:

> What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* at 390. As such, "the mere occurrence of all plaintiffs suffering as a result of a violation of the same provision of law is not enough." *Chi. Teachers Union*, 797 F.3d at 434. To satisfy commonality, a plaintiff must show the putative class claims "depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor." *Wal-Mart*, 564 U.S. at 349. "The critical point is the need for *conduct* common to members of the class." *McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 800 (7th Cir. 2017) (emphasis original) (internal quotation omitted). O'Bryan has not shown either class depends upon such common conduct or that he can generate common answers to the questions he poses in his certification papers. In fact, O'Bryan has not addressed the impact of *Dukes*'s mandate that common answers be analyzed as a critical feature of class certification at all.

**1.    The Travel Time Class Does Not Raise Common Contentions Capable of Class-Wide Resolution**

O'Bryan claims two common questions apply to the travel time class, which he frames as follows:

(1)     Is time that Defendant's Field Employees spent traveling between Defendant's shop and the jobsite at the beginnings and ends of their workdays compensable under Wisconsin state law?; and

(2)     If so, did Defendant's "Work Site and Travel" policy as written and as effectuated in practice result in its failure to compensate its Field Employees for all such travel time?

Pl.'s Br. 18. These questions are merely an example of the Supreme Court's observation that "[a]ny competently crafted class complaint literally raises common 'questions.'" *Wal-Mart*, 564 U.S. at 349. O'Bryan fails to show that either of these questions has an answer to the class – because they do not. And O'Bryan cannot merely creatively draft around *Dukes*.

O'Bryan's ability to state a common answer to the first question founders because not all travel between the shop and jobsites would be compensable under Wisconsin state law and, even if it were, that would require individual analysis of each employee's claim individually. The Wisconsin Department of Workforce Development has clarified that the WWPCL does not require compensating employees for travel time between home and the jobsite: "An employee who travels from home before their regular workday and returns to their home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether they work at a fixed location or on different job sites. Normal travel from home to work is not work time." Wis. Admin. Code DWD § 272.12(2)(g)(1); *Kieninger v. Crown Equip. Corp.*, 924

N.W.2d 172, 178-79 (Wis. 2019) (concluding plaintiff's home-to-work travel was not compensable under the regulations, despite plaintiff driving a company-owned vehicle).

Given Pember's clear written policy – compliant with the WWPCL's directive – that field employees were to report directly to the jobsite but could voluntarily request a ride in a Company vehicle, there can be no class-wide answer to O'Bryan's first "common question." Whether the time is compensable would require individual analysis of whether each employee worked at the shop before or after traveling. *See Jonites v. Exelon Corp.*, 522 F.3d 721 (7th Cir. 2008) (Noting in an FLSA case that the plaintiffs "want us to rule that because some Com Ed employees may sometimes do some work at lunch, all Com Ed employees are entitled to pay during their lunch break . . . . It is that argument . . . that is preposterous.").

There is no other way to determine liability under the WWPCL except for on a day-by-day, employee-by-employee, shift-by-shift, task-by-task basis. This makes the class action unworkable. *See Haley v. Kolbe & Kolbe Millwork Co.*, 2015 U.S. Dist. LEXIS 169266, at *39 (W.D. Wis. 2015) (denying class certification after noting liability for each class member would "involve multi-factor tests that require fact-intensive and individual inquires that will vary from class member to class member."). Pember clearly instructed its field employees to report directly to a jobsite, not the shop. (Pember Decert. Decl. ¶ 4.) Although some field employees voluntarily went to the shop (or another location selected by the foreperson) to carpool to the job site, the Company did not mandate that and did not require them to perform any work between arriving at the shop and the carpool leaving for the job site. (Pember Cert. Opp. Decl. ¶ 6.) Just because an

16

employee hitched a ride on some days (but not other days) does not mean he also performed compensable work. If field employees were asked by their foreperson to help load/unload vehicles before or after travelling from the shop to the job site, Pember's policy required them to record their time so they could be compensated for it. (Garfield Dep. 29:4-8.) That time was recorded and paid. If it wasn't, the employee bears the burden of proving the time worked, which would be proof on an individual basis. *E.g.*, *Kasten v. St.-Gobain Perf. Plastics Corp.*, 556 F. Supp. 2d 941, 952 (W.D. Wis. 2008) (noting an employee who brings an action for "unpaid minimum wages or unpaid overtime compensation . . . has the burden to prove that he performed work for which he was not properly compensated.") (quoting *Adams v. United States*, 471 F.3d 1321, 1326 (Fed. Cir. 2006)).

Proving liability and damages will require discovery from each class member about each shift he or she worked, where he traveled (from his home to the shop, from his home to directly to the jobsite), whether his foreman or supervisor asked him to come and drive a company vehicle to the jobsite or help load trucks, or simply said "we leave at 5:00 a.m. sharp if you want to carpool," what work was performed, and for how long.

The declarations of former Pember employees O'Bryan submitted with his motion for class certification prove that O'Bryan's second question has no common answers. Rather, the subjective understanding of the travel time policy varied between field employees, which cannot support commonality. *See Rozema v. Marshfield Clinic*, 174 F.R.D. 425, 431 (W.D. Wis. 1997) (admonishing that class definitions "should avoid criteria that are subjective (*e.g.*, a plaintiff's state of mind)"). Some declarants state they

17

long knew that carpooling time was not paid, *see, e.g.*, Sarnstrom Decl. ¶ 21; Swanson

Decl. ¶ 11; Lande Decl. ¶ 18, while other declarants claim they were entirely unaware

they were not compensated for the carpooling time (despite the opportunity to review

their time before it was submitted for payroll), *see, e.g.*, Decl. of Alex McNaughton ¶ 10,

Dkt. 59; Topper Decl. ¶ 16. All of this is also contrary to Pember's clear written policy in

the field handbook.

Consistent with the voluntary nature of the written carpooling policy, the

frequency with which declarants state they began their day at Pember's shop varies

greatly. *See, e.g.*, Swanson Decl. ¶ 8 (stating an average of 2-3 days per week); Decl. of

Peter Olson ¶ 6, Dkt. 60 (stating an average of 75% of workdays); Decl. of Zachary

Simpson ¶ 7, Dkt. 62 (stating all but "maybe one to two (2) days"). Part of the variation

in understanding of the travel time policy is a result of different forepersons

communicating with employees and expressing different preferences and availability for

the completely voluntary carpooling opportunities. *See* Swanson Decl. ¶ 11 ("To the best

of my recollection, my knowledge of this policy came from my Foremen, most recently

Brian Hoyt, and Troy Bauer."). Such communications by the forepersons is at least "one

step removed from" Pember's policies. *Abram v. UPS of Am., Inc.*, 200 F.R.D. 424, 430

(E.D. Wis. 2001) (denying class certification where plaintiffs failed to show defendant's

policy was "*in and of itself*, a discriminatory practice that provides the unifying thread

necessary for 'commonality' to exist.") (emphasis original).

Further, the declarations O'Bryan submitted show the specific legal grounds

potentially establishing liability (which Pember completely and fully denies) varies

among the putative class members. *See McCaster*, 845 F.3d at 801 (affirming trial court's denial of certification where plaintiff failed to identify "any unlawful conduct on [defendant's] part that spans the entire class and caused all class members to suffer the same injury."). For instance, while most declarants acknowledge Pember paid field employees who drove trucks and other equipment to the jobsite for their travel time, McNaughton states blanketly that he was not paid for that time. McNaughton Decl. ¶ 10. Curiously, McNaughton also never reported not being paid for that time after timecards were completed and posted in the shop. (Pember Cert. Opp. Decl. ¶ 7.) Other field employees apparently seek compensation for travel time when they were passengers, irrespective of whether they performed work at the shop before or after travelling. *See* Olson Decl. ¶ 15. And none of the declarations address whether field employees recorded their time allegedly worked at the shop before or after travelling or, more importantly, why they failed to do so.

This case is therefore like *Chambers v. MCI Worldcom Network Servs.*, 2001 U.S. Dist. LEXIS 27339 (W.D. Wis. 2001). There, plaintiffs sought class certification on behalf of all landowners whose property rights were allegedly violated when defendants ran fiber optic cable under the railroad defendant's right-of-way. *Id.* at *10. The court denied certification after jointly analyzing the commonality and typicality prongs of Rule 223(a). *Id.* at *19-22. It explained both defendants and the prospective class members had obtained their individual rights to the properties at issue "through such a large number of" deeds and other real property instruments that determining the specific rights held by each class member (and defendants) would require an individualized analysis of the

instruments. *Id.* There could be no common determination regarding liability and "proof of plaintiffs' claims would not necessarily prove the claims of the proposed class members." *Id.* at \*22. The court further noted it would have to engage in an individualized analysis to determine "whether each class member or a previous land owner consented to the installation of the cable." *Id.* at \*23. Yet O'Bryan asks this Court to certify a class that will require the same level of individualized liability determination the *Chambers* court wisely rejected.

Because Pember did not maintain a policy of requiring field employees to begin their day working at the shop before travelling to a job site, any liability determination is inherently individualized and inappropriate for class-wide adjudication. At the outset, what the "policy" was exists solely in the minds of the putative class members because – according to O'Bryan's theory of the case, the policy was apparently not the one that was actually written the field memo. Setting aside the complete lack of a common policy between the putative class member's brains, a factfinder will first have to determine whether each field employee ever even reported to the shop before travelling to a job site. If that occurred, then the factfinder must then determine whether they were asked to show up by their foreman, whether each plaintiff performed work at the shop, and did not merely show up to voluntarily catch a ride, and how much work (time-wise) was performed. All of these are individual inquiries that do not have an answer common to the class. *McCaster*, 845 F.3d at 801 (explaining that class certification is inappropriate when a case "raises only an amalgam of individual" claims that "may (or may not) be valid based on the employee's particular circumstances").

20

### 2. The Bonus Class Does Not Raise Common Contentions Capable of Class-Wide Resolution

O'Bryan's "common" questions for the bonus class similarly lack any answer common to the class. He frames the bonus class questions as follows:

(1)     Are the attendance incentive bonuses, June 30th Bonuses, and/or 8% Annual Bonuses Defendant paid to its hourly-paid, non-exempt employees non-discretionary in nature?; and

(2)     If so, did Defendant's admitted practice of not including such bonuses in those employees' regular rates of pay for overtime calculation and compensation purposes result in its unlawful failure to compensate them at their lawful and correct overtime rates of pay?

Pl.'s Br. 19, Dkt. 54.

To start, O'Bryan shoehorns two separate bonuses – which he treats as three different bonuses – into a single question and asks if they are non-discretionary in nature. But determining whether each bonus is non-discretionary is itself a fact-specific analysis under the relevant regulations. *See* 29 C.F.R. § 778.200(a).[2] A bonus is discretionary if "both the fact that the payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly[.]" *Id.* at § 778.200(a)(3).

---

[2] The WWPCL requires an employer to pay "time and one-half the regular rate of pay for all hours worked in excess of 40 hours per week." Wis. Admin. Code DWD § 274.03. Although the WWPCL does not define "regular rate," the Department of Workforce Development has interpreted the definition to be consistent with the FLSA and include only nondiscretionary bonuses. Wis. Dep't of Workforce Development, *Hours of Work and Overtime FAQ*, https://dwd.wisconsin.gov/er/laborstandards/overtimefaq.htm (*last accessed* Mar. 7, 2022) (page formerly named ERD-8298-P).

Because each bonus Pember offered was different, and not all employees received each bonus, it will be necessary to determine whether each is, in fact, non-discretionary compensation. Even within this analysis, some payments of the same bonus may be discretionary. For example, Pember's special, one-time payment of an additional $500 for perfect attendance in 2018 will require separate analysis from the other attendance bonuses. This can only be determined for each class member by looking at their individual attendance records and behavior

The nature of the profit-sharing bonus will similarly require individualized liability determinations. By default, Pember paid any profit-sharing bonus as a contribution to the employee's 401(k) retirement account. Pember Decert. Decl. ¶ 12, Dkt. 69; Pember Cert. Opp. Decl., Ex. A at p. 2. Pember contends such payments are excluded from the regular rate of pay under 29 C.F.R. § 778.200(a)(3)-(4). Because some employees who received the profit-sharing bonus chose to take the 401(k) deposit rather than the cash-out payment (less withholdings), applicability of this bonus to the regular rate calculations requires a plaintiff-by-plaintiff analysis for the entire class.

Even assuming each of the bonuses discussed above was required to be included in the regular rate of pay for overtime calculations, under O'Bryan's theory of the case, Pember would only liable if it failed to include the bonus in the regular rate for overtime a class member worked during the same period in which they earned the bonus. 29 C.F.R. § 778.209. Each of the bonuses was "earned" at different times throughout the work season. So, each class member must show they worked overtime during the same time they earned the bonus. The factfinder must compare each individual Plaintiff's pay

records, when bonuses were earned, which bonuses were earned, and then recalculate any rate of pay issues plaintiff-by-plaintiff, pay period-by-pay period, and shift-by-shift. This cannot be done on a class-wide basis, as *McCaster* makes clear. There, plaintiffs alleged defendant failed to pay vacation time upon separation and sought certification of a class including all employees who separated from defendant in the relevant period. *McCaster*, 845 F.3d at 801. The Seventh Circuit affirmed the trial court's denial of certification because plaintiffs failed to show either that defendant's policy facially violated the law or that it had a statewide practice that violated the law. *Id.* Rather, plaintiffs "simply argue[d] that some separated employees . . . did not receive all the vacation pay they were due under the applicable policy." *Id.* As such, "establishing those violations (if there were any) would not involve any classwide proof." *Id.*

Similarly, some employees received the profit-sharing bonus as a percentage of their total income on non-wage rate jobs. Pember Decl. ¶ 12. In such cases, the employee was already compensated for both their straight-time earnings and any overtime they worked. 29 C.F.R. § 778.210. Either way, determining whether the employee was already properly compensated for overtime will require the factfinder to engage in an individualized analysis, not a class-wide determination.

As with the travel time class, O'Bryan raises common questions for his bonus class that lack common answers. O'Bryan sidesteps the difficult part of each analysis by begging the question: "[*S*]*hould* the Court ultimately" answer yes to each question as posed, then Pember would be liable to the class. Pl.'s Br. 20. But he cannot say *how* the Court may affirmatively answer each question on a class-wide basis, which is the relevant

question for commonality. *Wal-Mart*, 564 U.S. at 390. Because O'Bryan fails to show either of his classes satisfy Rule 23(a)(2)'s commonality requirement, his motion to certify these classes should be denied.

### C.    O'Bryan's Claims are Not Typical

O'Bryan has also failed to show he satisfies Rule 23's typicality requirement, which mandates that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3 589, 595 (7th Cir. 1998) (internal quotations and citations omitted). Typicality is closely related to commonality, but "the commonality inquiry focuses on what characteristics are shared among the whole class while the typicality inquiry focuses on the desired attributes of the class representative." *Howard v. Cook Cty. Sheriff's Office*, 989 F.3d 587, 606 (7th Cir. 2021) (quoting Newberg on Class Actions § 3:31.). Typicality follows commonality to ensure the "class representative will adequately pursue her own claims, and if those claims are 'typical' of the those of the rest of the class, then her pursuit of her own interest will necessarily benefit the class as well." *Id.* at 605.

Because he cannot show either class satisfies commonality, O'Bryan cannot show his claims are typical of the myriad factual and legal theories presented by the putative class members. He rests on his bare assertions that the travel time policy was uniformly applied and that he received both the attendance incentive and "June 30th Bonuses"

(although apparently not the "8% Annual Bonus" he identifies as a separate bonus). Pl.'s Br. 21-22. Pember has already addressed why no named plaintiff, much less O'Bryan, would be typical and representative of the amalgam of individual claims asserted by the putative class.

An example crystalizes why O'Bryan's self-interest in pursuing his own claims is insufficient to ensure typicality for the travel time class. As defined, the travel time class include forepersons, including Cameron Sarnstrom, who submitted a declaration in support of O'Bryan's motion for class certification. Sarnstrom notes Pember assigned him and other forepersons crew cab trucks, which they used to haul equipment and other materials to and from jobsites. Sarnstrom Decl. ¶¶ 6-7. He asserts he would often go to the shop in the morning to fuel his Company truck and speak to other managers about the project, including when he subsequently met his crew elsewhere to carpool to the jobsite *Id.* at ¶¶ 12, 14. He also states he sometimes hauled equipment in his Company assigned vehicle, but was not paid for that travel time. *Id.* at ¶16. Moreover, Sarnstrom and other forepersons were directly responsible for recording their crew's time on Heavy Jobs for later confirmation. *Id.* at ¶ 15. They could also control the carpooling arrangements for their crews. Topper Decl. ¶¶ 10-12.

Unlike Sarnstrom, O'Bryan was a laborer. He had no need to go to the shop in the morning unless his foreperson directed him there to help load equipment.[3] This would

---

[3] A more fulsome comparison would require knowing how frequently O'Bryan asserts he went to the shop before a jobsite and why he did so. O'Bryan – the putative class representative – failed to submit any testimonial evidence about his travel time with his

have been rare, as Pember employed shop employees to perform such tasks. Pember Cert. Opp. Decl. ¶¶ 5-6. Further, because O'Bryan, as a laborer, was not assigned a crew cab truck, he cannot produce evidence that he was not paid for driving a crew cab to the job site with equipment in the bed of the truck, as Sarnstrom complains of in his declaration. Sarnstrom Decl. ¶¶ 11, 16. O'Bryan cannot show his travel time claims, which will necessarily center on whether Pember required him to, or at least knew of, work at the shop before or after travelling to a jobsite, are typical of that of a foreperson. *See O'Neill v. Gourmet Sys. of Minn., Inc.*, 219 F.R.D. 445, 453 (W.D. Wis. 2002) (denying class certification where plaintiff's claims were not typical because his alleged injury stemmed from lack of adequate non-tribal identification, while many putative class members possessed adequate non-tribal identification cards). Indeed, O'Bryan did not submit any testimonial evidence about his own travel time claims with his motion for class certification. Only declarations by other putative class members or FLSA opt-ins. *See Anderson*, 986 F.3d at 777 (affirming denial of class certification where plaintiff failed to carry burden of showing that "certification [was] proper by a preponderance of the evidence").

Similarly, some declarants in support of O'Bryan's motion state they knew Pember did not generally compensate travel time, Sarnstrom Decl. ¶ 21; Swanson Decl. ¶ 11; Lande Decl. ¶ 18, while other declarants claim they were entirely unaware they were not compensated for the carpooling time (despite the opportunity to review their time

---

motion for class certification; he cannot do so on reply. *See Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 897 (arguments not raised in opening brief are waived).

before it was submitted for payroll), McNaughton Decl. ¶ 10; Topper Decl. ¶ 16. It is difficult to understand how O'Bryan can show his claims are typical of both theories of liability, as they are mutually exclusive. *See Howard*, 989 F.3d at 606 (reversing the district court's class certification, in part because named plaintiffs, who alleged they were victims of direct harassment, were "poor proxies for any class members whose claims rise or fall on ambient harassment."). If O'Bryan had a subjective understanding of Pember's policy similar to Sarnstrom, then he will have no way to explain – as a class representative – the theory of those individuals who purportedly thought they were being paid for travel time, yet did not inquire about the numerous hours ostensibly missing from each paycheck. He cannot be typical of both theories of liability. Because the class is an amalgam of claims proceeding on distinct theories, O'Bryan's claims (whatever they may be) cannot "share the same essential characteristics as the class claims." *Howard*, 989 F.3d at 606 (reversing class certification).

O'Bryan similarly fails to show with evidence his claims are typical of all members of the putative bonus class, which includes all of Pember's hourly-paid, non-exempt employees. O'Bryan contends he and other employees "typically work in excess of forty (40) hours each workweek[,]" but offers no evidence for any employees other than field employees. Pl.'s Br. 12 n.67. Moreover, O'Bryan acknowledges Pember did not maintain a clear formula for calculating the profit-sharing/June 30th bonuses, but historically paid some categories of employees, including administrative and shop employees, a flat amount, while paying all other field employees (including laborers like O'Bryan) a percentage of their total non-wage rate earnings. *Id.* at 15. O'Bryan's claim as

it relates to the profit-sharing bonus is therefore subject to the defense that the percent-based calculation fully compensated him for any relevant overtime he worked. O'Bryan's claim cannot be typical of the proposed class if he suffered no injury at all. *See O'Neill*, 219 F.R.D. at 453 (denying class certification). Conversely, if administrative employees did not work overtime (and so suffered no injury themselves), O'Bryan is not typical of their claims. *Id.*

O'Bryan's claims are not typical of the claims for either proposed class. The Court should deny class certification.

## III.   THE PROPOSED CLASSES DO NOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(b)(3)

Even if O'Bryan's proposed classes satisfied all the requirements of Rule 23(a), he must show they satisfy one of the requirements of Rule 23(b). O'Bryan proceeds under Rule 23(b)(3), which "requires an additional showing (1) that the question of law or fact common to the members of the proposed class predominate over questions affecting only individual class members;; and (2) that a class action is superior to other available methods of resolving the controversy." *Blow*, 855 F.3d at 806. "This requirement builds on commonality; whereas Rule 23(a)(2) requires the existence of a common question, Rule 23(b)(3) requires the common question(s) to 'predominate' over the individual ones." *Howard*, 989 F.3d at 607.

For all the reasons O'Bryan cannot show either class satisfies Rule 23(a)(2) commonality, he cannot show the common questions "predominate." He reiterates the artful questions he claims are "common" for each class, then asserts the answer to those

28

questions, whether in the class's favor or against, resolve the case. But by posing the ultimate question (i.e., whether Pember is liable) as a common question, O'Bryan elides over the underlying and complicated reality. Those questions simply do not have common answers.

The Seventh Circuit's recent opinion in *Howard* underscores why O'Bryan has not shown that common questions predominate. There, female employees of Cook County and the Cook County Sheriff's Office sued their employers and sought class certification, alleging defendants failed to prevent sexual harassment by inmates. *Howard*, 989 F.3d at 592. The Seventh Circuit reversed the trial court's certification of a class, emphasizing that the "reasonableness of an employer's response to harassment is a fact-bound inquiry." *Id.* at 608. The Court acknowledged that plaintiffs (like here) had alleged the jail complex had a central and uniformly applied policy. *Id.* Still, that did not "translate[] to a finding that employer liability is a common question that predominates." *Id.* Because the policy itself (like here) did not violate the law on its face, "the reasonableness of those policies . . . still depends on the specific circumstances of the plaintiff(s) or class member(s) challenging the policies." *Id.* at 608-09. Employer liability was therefore "not a common question for the current class." *Id.* at 609.

The same is true here. Whether an employee's travel time from the shop to the jobsite is compensable turns on whether the employee first performed compensable work at the shop. Wis. Admin. Code DWD § 272.12(2)(g)(1). Whether Pember's travel policy caused an employee not to receive all wages owed turns on what the individual employee subjectively understood the policy to be (despite it being clearly written and compliant

with Wisconsin law) and how that subjective understanding affected the employee's voluntary actions. *See Rozema*, 174 F.R.D. at 431 Whether a bonus is non-discretionary turns on the circumstances surrounding the bonus. 29 C.F.R. § 778.200(a). And whether Pember's practice deprived employees of overtime compensation turns on the employee earning a nondiscretionary bonus in the same time period the employee worked overtime. These individual questions, each central to liability, predominate over the broader question of liability. O'Bryan attempts to draft around these questions by effectively framing the question as, "whether Pember is liable." But the actual questions that underly that determination cannot be ignored. *Howard*, 989 F.3d at 609.

For the same reasons again, O'Bryan cannot show a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A class action is superior when it "would achieve economies of time, effort, and expense," *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997), thus trumping "the likely difficulties in managing a class action[,]" Fed. R. Civ. P. 23(b)(3)(D). Here, there will be no economies of time, effort, or expense if the classes are certified, as the Court will not be able to address any meaningful questions of law or fact on a class-wide basis. Liability, not just damages, must be determined class member by class member. But there is already a mechanism for determining liability on an individual basis. Each plaintiff can bring their own claim.

## CONCLUSION

Because O'Bryan has not shown his proposed classes satisfy all the requirements of Rule 23, the Court should deny his motion for class certification.

Dated:  March 18, 2022

**NILAN JOHNSON LEWIS PA**

By:   */s/ Daniel J. Supalla*
David A. Schooler (MN #0225782)
Daniel J. Supalla (MN #0387064)
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
Telephone:      (612) 305-7500
Fax:              (612) 305-7501
dschooler@nilanjohnson.com
dsupalla@nilanjohnson.com

**ATTORNEYS FOR DEFENDANT PEMBER COMPANIES, INC.**