IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RANDY O'BRYAN, on behalf of himself and all others similarly situated,

    Plaintiff,

v.

PEMBER COMPANIES, INC.,

    Defendant.

OPINION and ORDER

20-cv-664-jdp

---

Plaintiff Randy O'Bryan is a former employee of defendant Pember Companies, Inc., a construction and excavation company. O'Bryan contends that Pember violated state and federal labor laws by failing to pay employees for time spent traveling between Pember's shop and construction sites and by not including bonus pay when it calculated its employees' overtime rates. O'Bryan seeks to represent a collective action under the Fair Labor Standards Act (FLSA) and a class action under state law. The court previously approved the parties' stipulation for conditional certification of O'Bryan's FLSA claims. Dkt. 41.

Two related motions are before the court. O'Bryan moves to certify two classes under Federal Rule of Civil Procedure Rule 23: a "travel time class" for employees who were not paid for travel from the shop to the jobsite and a "bonus class" for employees whose bonuses were not included in their overtime pay rates. Dkt. 53. Pember moves to decertify the FLSA collectives under 29 U.S.C § 216(b). Dkt. 66.

The court will grant Pember's motion and deny O'Bryan's. O'Bryan has not identified any significant questions of law or fact for the travel time class that can be resolved on a class-wide basis. Whether employees should have been paid for travel between the shop and the

jobsite will require individualized factfinding about each employee's job responsibilities and the tasks employees performed at the shop.

There are no common questions for the bonus class either. The proposed class includes employees who received any of three distinct bonuses, and determinations about any one bonus wouldn't be relevant to class members who didn't receive it. There could be common questions if the class was divided into three subclasses, but O'Bryan hasn't shown that the subclasses are so numerous that joinder would be impracticable.

BACKGROUND

A. Travel time

Pember is a Wisconsin company that provides construction, concrete, and excavation services. The company operates out of its shop in Menominee, Wisconsin. The shop is where Pember stores its tools, vehicles, and equipment when they aren't being used on a job. It's also where the company's supervisors, managers, and mechanics work. The rest of Pember's employees perform most of their work in the field at jobsites across Wisconsin and Minnesota.

Pember's 2018 Field Handbook contains a "Work Site and Travel" policy. The policy provides that employees must report to their assigned jobsite at the start of the workday and that they'll be released from work at the jobsite. Dkt. 69-1, at 5. The policy tells employees that they are expected to furnish their own transportation to and from the jobsite. *Id.* It also says that "[w]hen there is available space in a company vehicle traveling to a job site, [employees] may request permission to ride along, but [that] travel time will not be considered time worked." *Id.*

The field employees are organized into crews that correspond to a specific job or jobsite. Each crew is managed by a foreman that typically works on-site with the laborers. Foremen are assigned a crew cab that they are allowed to take home for the duration of a job. Many foremen, though not all, would drive their vehicle to the shop in the morning so employees who wished to ride along to the jobsite could do so. When employees rode with their foreman from the shop to the jobsite, they would typically prepare for the work day by gathering tools and materials. After the crew was finished working at the jobsite for the day, employees would often bring waste from the jobsites back to the shop, clean out the vehicles they used, or gather materials and supplies in preparation for the next day.

Employees were paid for travel between the shop and the jobsite only under certain circumstances. The parties dispute what those circumstances were. Pember says that if an employee was specifically asked to come to the shop and help load vehicles before traveling to the job site, the employee was compensated for their travel time to the jobsite that day. Dkt. 69 (Pember Decl. ¶ 6). Some employees said that they were paid for travel time only if they were driving one of Pember's "big rigs"—such as a dump truck—or a vehicle with a trailer behind it. Dkt. 60 (Olson Decl. ¶ 14). But the parties agree that Pember didn't pay field employees for most trips between the shop and the jobsite.

**B. Bonuses**

Pember offers several bonuses to its employees, three of which are relevant to this case. The first is a bonus awarded for perfect attendance in a given month. An employee earns $10 for the first month of perfect attendance, $25 for the second month, and $30 for each additional month. In 2018, Pember awarded an additional one-time bonus of $500 to employees who had perfect attendance from August 1 until the end of the work season.

The second bonus is paid to employees who return to work for Pember for multiple seasons. The bonus doesn't have a formal name, so the court will refer to this bonus as the "retention bonus." Pember pays retention bonuses in July of each year following the season in which they are earned.

The third bonus, which plaintiffs call the "Annual 8% bonus," is paid only to employees who work as foremen, operators, or finishers.[1] This bonus was equal to eight percent of the employee's non-wage rate production work and was paid in December before the end of each calendar year.

Pember did not include any of these bonuses in calculating its employees' regular rate of pay for overtime until 2021, after this lawsuit was filed.

## ANALYSIS

### A. Legal standard

O'Bryan seeks to certify his state law claims under Federal Rule of Civil Procedure 23, which imposes various requirements that all class actions must satisfy: (1) the scope of the class as to both its members and the asserted claims must be "defined clearly" using "objective criteria," *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015); (2) the class must be sufficiently numerous, include common questions of law or fact, and be adequately represented by plaintiffs who have claims typical of the class, Fed. R. Civ. P. 23(a); and (3) the

---

[1] Pember says that the retention bonus and the annual eight percent bonus are actually the same "profit-sharing" bonus. Dkt. 70, at 8. But the bonuses were paid out at different times and had different eligibility criteria, so it makes sense to treat them separately.

class must meet the requirements of at least one of the types of class actions listed in Rule 23(b).

O'Bryan focuses on Rule 23(b)(3), which applies if the questions of law or fact common to class members predominate over any questions affecting only individual members and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." These requirements overlap with the requirements for commonality and typicality under Rule 23(a); all of the requirements focus on whether the court or factfinder can resolve issues across the class rather than through individualized determinations. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016). ("Predominance is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication.") (internal quotations and alterations omitted); *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015) (to satisfy commonality requirement, "[t]he claims must depend upon a common contention that is capable of class wide resolution").

O'Bryan's claims under the FLSA are governed by 29 U.S.C. § 216(b), which provides that plaintiffs may bring a collective action "for and [o]n behalf of . . . themselves and other employees similarly situated." Although the language in Rule 23 and § 216(b) is not the same, the court of appeals has stated that "there isn't a good reason to have different standards for the certification of the two different types of action," so it has incorporated the requirements for Rule 23 into § 216(b). *Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770, 772 (7th Cir. 2013). The party seeking class certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022).

5

With these principles in mind, the court concludes that O'Bryan has not carried his burden to show that either of his proposed classes should be certified.

**B. Travel time class**

The travel time class includes all hourly-paid, non-exempt Pember employees who traveled between Pember's shop and the jobsite in a company vehicle within two years of when this lawsuit was filed. Dkt. 53, at 1. O'Bryan's claim turns on whether employees should have been paid for their travel time. To determine whether that question can be resolved on a class-wide basis, the court must consider the substantive law underlying O'Bryan's claim. *See Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019) (courts may consider the merits to the extent that they overlap with the requirements for certification).

Travel from home to work is not compensable under either Wisconsin or federal law. Wis. Admin. Code DWD § 272.12(2)(g)(1); 29 U.S.C. § 254(a)(1). But employees must be compensated for travel that is "all in the day's work." DWD 272.12(2)(g)5; 29 C.F.R. § 785.38. The mere fact that travel originated from a designated location and took place in a company vehicle does not, without more, mean that travel was part of the workday. *Morgan v. Crush City Constr., LLC*, No. 19-cv-27-wmc, 2022 WL 2752614, at *6 (W.D. Wis. July 14, 2022) (citing *Pietrzycki v. Heights Tower Serv., Inc.*, 290 F. Supp. 3d 822, 837 (N.D. Ill. 2017) ("an employer's decision to provide transportation and designate a meeting location does not transform ordinary commuting into hours worked.")). The workday begins when an employee commences their "principal activities." *Chagoya v. City of Chi.*, 992 F.3d 607, 617 (7th Cir. 2021); *Kieninger v. Crown Equip. Corp.*, 2019 WI 27, ¶17, 386 Wis. 2d 1, 13, 924 N.W.2d 172, 178. Principal activities include the tasks employees are hired to do as well as tasks which are an "integral and indispensable part" of the employee's work. *Steiner v. Mitchell*, 350 U.S. 247,

253 (1956). So if an employee is required to perform work-related tasks at a designated location before going to his or her workplace, employees must be paid for travel from the designated location to the workplace. Substantively identical federal and state regulations provide that:

> Time spent by an employee in travel as part of his [their] principal activity, such as travel from job site to job site during the workday, must be counted as hours worked. Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the workplace is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice.

29 C.F.R. § 785.38; DWD 272.12(2)(g)5 (using "their" instead of "his").

O'Bryan doesn't cite evidence that there was a company-wide policy that required field employees to report to the shop and perform prep work before traveling to the jobsite. Instead, the number of days that employees drove to the shop varied from crew to crew and from employee to employee. *Compare* Dkt. 58 (Lande Decl. ¶ 12) (drove to the shop approximately 50% of his work days), *with* Dkt. 62 (Simpson Decl. ¶ 7) (went to the shop all but "one to two days"). Whether an employee drove to the shop or directly to the jobsite depended on factors including the distance between the jobsite and the employee's home, *see* Dkt. 65 (Witting Decl. ¶ 10), and whether space was available in a company vehicle. And crews coordinated travel directly with their foremen. *See* Dkt. 64 (Topper Decl. ¶ 10). Some individual foremen may have required their crews to report to the shop on certain days. But cases in which low-level managers use their discretion to make individual decisions, without guidance from an overarching company policy, do not present common questions because the evidence varies from plaintiff to plaintiff. *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 375 (7th Cir. 2015).

O'Bryan nevertheless contends that travel time between the shop and the site is categorically compensable because employees always performed work at the shop before and after their travel. *See* Dkt. 74, at 7. He says that Pember knew that "on the occasions [that] field employees traveled from the shop to the jobsite at the beginning of their workdays," employees "spoke with managers, attended meetings, gathered materials, prepped trucks for the jobsite, and performed other similar tasks" before heading to the site. *Id*. The court takes O'Bryan to contend that travel was part of a day's work because the employees' workdays uniformly began and ended at the shop.

As this court observed in similar case about travel between a construction company's shop and the jobsite, determining whether travel was all in a day's work "necessarily involve[s] individualized questions." *Crush City Constr,* 2022 WL 2752614, at *8. Contrary to O'Bryan's assertion, the record shows that not all employees performed work-related activities every single day that they rode from the shop. Although some employees said that they loaded trucks each day that they traveled between the shop and the jobsite, Dkt. 62 (Simpson Decl. ¶ 9); Dkt. 63 (Swanson Decl. ¶ 8), others said that they only "typically" performed that kind of prep work, Dkt. 65 (Witting Decl. ¶ 11); Dkt. 64 (Topper Decl. ¶ 14). The exact tasks that employees performed at the shop apparently varied, ranging from loading trucks to speaking with managers. And the proposed class includes both crew members and crew foremen, who had different job responsibilities. Given those variations, the question of whether workdays began at the shop cannot be resolved on a class-wide basis.

O'Bryan had the burden to provide a viable method for determining liability "that does not require individualized, fact-based mini-trials for each potential class member." *Gorss Motels, Inc. v. Brigadoon Fitness, Inc*., 29 F.4th 839, 846 (7th Cir. 2022) (quoting with approval the

8

opinion of the district court). And O'Bryan has not shown that the question of whether travel time was compensable can be resolved without inquiring into what each employee did each day that they were in the shop. *See Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 WL 239066 (W.D. Wis. Jan. 10, 2013) (denying class certification because "[d]etermining whether a given employee suffered a meal break violation will depend largely on numerous highly fact-specific inquiries as to the reason why a technician worked during all or part of his meal break on a particular day").

O'Bryan also contends that class certification is proper because the policy against paying for travel time was uniformly instituted in practice. The question of whether an employer has an unlawful policy is usually capable of class-wide resolution because whether such a policy exists can be answered with common proof. *Bell,* 800 F.3d at 375. But here, proving that Pember had a class-wide policy against paying for travel time between the shop and the jobsite would not resolve any issues about Pember's liability to the class. Whether Pember's policy violated the law may vary from employee to employee and from day to day, depending on what employees did before and after their travel. Employees would still need to offer individualized proof to show that the policy was unlawful as applied to them. *See Dorman v. DHL Exp. (USA), Inc.,* No. 09-cv-99-bbc, 2010 WL 446071, at *5 (W.D. Wis. Feb. 3, 2010) (denying class certification because the validity of blanket policy of not paying drivers overtime wages will vary from driver to driver). Because O'Bryan has not shown that there are common questions for the travel time class, the proposed class will not be certified and the FLSA collective will be decertified.

**C. Bonus class**

The bonus class includes all hourly-paid, non-exempt Pember employees who received compensation in addition to their hourly wages, "such as" attendance bonuses, retention bonuses, and eight percent annual bonuses.[2] Dkt. 53, at 1. O'Bryan contends that Pember should have included these bonuses when it calculated its employees overtime pay rate. There are two problems with this proposed class: (1) there are no questions that can be resolved on a class-wide basis and (2) O'Bryan hasn't shown that the class is sufficiently numerous.

First, O'Bryan has not identified any questions that are common for the entire bonus class. He contends that there is a common question whether the attendance bonuses, retention bonuses, "and/or" eight percent annual bonuses are discretionary in nature. Dkt. 54, at 19. If the bonuses were discretionary, Pember had no obligation to include them when calculating its employees' regular rates of pay. *See* 29 C.F.R. § 778.200(a).[3] But the question of whether any one of the three bonuses was discretionary is not common because not every class member received all three bonuses. The bonuses had different eligibility criteria and were paid out at different times. It appears not that even O'Bryan, the named plaintiff, received all three: his brief says only that he received attendance and retention bonuses. *See* Dkt. 54, at 21–22. And a determination that one of the bonuses was discretionary wouldn't be relevant to any class

---

[2] O'Bryan doesn't identify any bonuses other than the three he lists. It appears that Pember also offers a separate referral bonus, *see* Dkt. 69, ¶ 11, but O'Bryan doesn't discuss it.

[3] Wisconsin statutes do not define "regular rate of pay" or how to calculate it, but the Wisconsin Department of Workforce Development has issued guidance that mirrors the federal requirements. *See* Hours of Work and Overtime Frequently Asked Questions, *available at* https://dwd.wisconsin.gov/er/laborstandards/overtimefaq.htm. Wisconsin courts defer to the DWD's guidance on this issue. *See Kuhnert v. Advanced Laser Machining, Inc.*, 2011 WI App 23, ¶ 13, 331 Wis. 2d 625, 633, 794 N.W.2d 805.

members who didn't receive that bonus. A determination that the attendance bonus was discretionary, for example, wouldn't resolve any aspects of the litigation for class members who received only the retention bonus.

O'Bryan's proposed class is really three classes in one. It includes three distinct groups of employees: (1) employees who received a retention bonus; (2) employees who received an attendance bonus; and (3) employees who received an eight percent bonus. When possible, courts should amend defective class definitions rather than deny class certification. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014). Here, the question of whether a given bonus was discretionary would be common as to all employees who received that bonus. So if O'Bryan's class definition was amended to divide the class three distinct subclasses, one for employees who received each type of bonus, each subclass would present a common question. That would require finding another named plaintiff to represent the eight percent bonus subclass, which O'Bryan didn't receive. But the record suggests that the eligibility criteria for each of the bonuses didn't vary from employee to employee, so the determining whether any one of the bonuses was discretionary would resolve a significant aspect of the litigation for all members of the subclass.

But even if the court amended O'Bryan's class definition, certification would be improper for a second reason: O'Bryan has not shown that any of the bonus subclasses are sufficiently numerous. Rule 23(a)(1) requires that the proposed class be so numerous that joinder is impracticable. A rule of thumb in the Seventh Circuit is that a proposed class of greater than 40 satisfies the numerosity requirement. *Anderson v. Weinert Enters.*, 986 F.3d 773, 777 (7th Cir. 2021). But a class of 40 or more does not guarantee numerosity. *Id.* Determining whether joinder is impracticable requires evaluation of "the nature of the action, the size of the

11

individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id.* (quoting 7A C. Wright & A. Miller, Federal Practice & Procedure § 1762 (3d ed.)).

O'Bryan estimates that there are around 170 members in the two proposed classes combined. He bases that estimate on the 171 employees that Pember identified as potential members of the two conditionally-certified FLSA collectives. *See* Dkt. 57. The state-law claims have a shorter statute of limitations than the FLSA claims, so the FLSA collectives are likely larger than the state-law classes. But even if the court accepts that 170 is a reasonable estimate for the size of the two classes together, O'Bryan doesn't attempt to explain or estimate how many members are in *each* class. O'Bryan does not say how many of the 170 are members of the travel time class; how many are members of the bonus class; and how many are members of both.

O'Bryan has not adduced any evidence of how many of Pember's employees received a bonus. He has not identified, for example, payroll records or statements from employees about how common the bonuses were. To support his contention that his two proposed classes are sufficiently numerous, O'Bryan says Pember employed between 70 to 90 employees during any given month, nearly all of whom were hourly employees. *See* Dkt. 56 (Garfield Dep. at 13:10–14, 16:12–17). But nothing in the record suggests that all of those hourly employees are members of the bonus class. Courts may make common sense assumptions to determine numerosity, so long as there is underlying evidence upon which to base those assumptions. *Molinari v. Fin. Asset Mgmt. Sys., Inc.*, No. 18 C 1526, 2020 WL 4345418, at *5 (N.D. Ill. July 29, 2020); 1 William B. Rubenstein, Newberg on Class Actions § 3:13 (5th ed. June 2020 update) ("Generally, a plaintiff must show enough evidence of the class's size to enable the

court to make commonsense assumptions regarding the number of putative class members."). But O'Bryan doesn't identify any evidence that would allow the court to assume or infer that most of Pember's hourly employees are members of the bonus class.

Instead, the record suggests that relatively few hourly employees received the bonuses he identifies. All nine of the opt-in plaintiffs who submitted a declaration to the court in support of O'Bryan's motion discussed Pember's travel policy. But only two say that they ever received a bonus. Moreover, as explained above, O'Bryan's "bonus class" presents common questions only if it is divided into three sub-classes. One plaintiff, Cameron Sarnstrom, says that he received all three bonuses. Dkt. 61, ¶¶ 24–27. The other plaintiff, Dustyn Topper, says only that he received the attendance bonus. Dkt. 64, ¶ 17. A subclass may only be certified if the subclass is so numerous that it could stand on its own as an independent class. *See Johnson v. Meriter Health Servs. Emple. Ret. Plan*, 702 F.3d 364, 368 (7th Cir. 2012). Here, O'Bryan fails to show that the entire proposed "bonus class" is sufficiently numerous, much less that each of the three subclasses is sufficiently numerous.

O'Bryan does not provide any other reasons why joinder is impracticable. There is no suggestion that O'Bryan has had difficulty contacting any class members, and he concedes that class members are not "so geographically dispersed such that joinder [is] impractical." Dkt. 74, at 5. He contends only that the sheer size of the class makes joinder impracticable, relying on his good faith estimate that there are 170 members of the putative classes. But without any evidence to support his claim that a similar number of employees received one of Pember's bonuses, his estimate is merely speculative. "As the party with the burden of proof, [O'Bryan] needed to attend diligently . . . to the demands of Rule 23." *Anderson*, 986 F.3d at 778. O'Bryan's sparse showing does not meet his burden, and he does not explain why he was unable

to substantiate his estimate with definitive evidence. The court will deny O'Bryan's motion for class certification and grant Pember's motion to decertify the FLSA collective. *See De Leon v. Grade A Constr., Inc.,* No. 16-CV-348-JDP, 2017 WL 6375821, at *3 (W.D. Wis. Dec. 13, 2017) (applying Rule 23 numerosity requirement to FLSA collective action).

Because O'Bryan has not shown that it would be impracticable to join the members of his proposed bonus class, he may wish to join other employees to his bonus-pay claim under Federal Rule of Civil Procedure 20. But the August 19, 2022 deadline for summary judgment is fast approaching, and the court would like to avoid disrupting the schedule. If O'Bryan wishes to join additional plaintiffs to his bonus-pay claim, he should inform the court as soon as possible, but no later than August 15, 2022. Otherwise, the case will proceed solely on O'Bryan's individual claims.

## ORDER

IT IS ORDERED that:

1. Plaintiff Randy O'Bryan's motion for class certification, Dkt. 53, is DENIED.

2. Defendant Pember Companies, Inc.'s motion for decertification, Dkt. 66, is GRANTED.

3. O'Bryan may have until August 15, 2022, to inform the court whether he wishes to join additional plaintiffs to his bonus-pay claim.

Entered August 8, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge